UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Lance Gerald Milliman,

                    Plaintiff,                    Court File No.  16-cv-2008 (DSD/LIB)

        v.                                        **REPORT AND RECOMMENDATION**

Nancy A. Berryhill,[1]
Acting Commissioner of Social Security,

                    Defendant.

        Plaintiff Lance Gerald Milliman ("Plaintiff"), proceeding *pro se*, seeks judicial review of

the decision of the Commissioner of Social Security ("Defendant") denying his applications for a

period of disability, disability insurance benefits, and for supplemental security income. (Compl.,

[Docket No. 1], at 1). The matter was referred to the undersigned United States Magistrate Judge

for report and recommendation, pursuant to 28 U.S.C. § 636 and Local Rule 72.1. The Court has

jurisdiction over the claims pursuant to 42 U.S.C. §§ 405(g).

        Both parties submitted motions for summary judgment, [Docket Nos. 16, 22], and the

Court took the matter under advisement on the written submissions pursuant to Local Rule

7.2(c)(2). For the reasons discussed below, the Court recommends that Plaintiff's Motion for

Summary Judgment, [Docket No. 16], be **DENIED**, and Defendant's Motion for Summary

Judgment, [Docket No. 22], be **GRANTED**.

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill is automatically substituted as the Defendant in the present matter. See, Fed. R. Civ. P. 25(d).

## I.    STATEMENT OF FACTS

### A.    Procedural History

On March 5, 2013, Plaintiff filed the present applications for a period of disability, disability insurance benefits, and social security income payments under Titles II and XVI of the Social Security Act, 42 U.S.C. §§401–434, 1381–1385. (See, Tr. 265–79).[2] Plaintiff alleged that he had become disabled on January 29, 2010. (Tr. 265, 269).[3] The Commissioner approved Plaintiff's claim for social security income with a disability onset date of August 11, 2013, as opposed to the January 29, 2010, date alleged by Plaintiff, and affirmed that decision upon reconsideration. (Tr. 185–86, 192–93). The Commissioner denied Plaintiff's claims for a period of disability and disability insurance benefits on August 19, 2013, and on November 27, 2013; the Commissioner affirmed that denial upon Plaintiff's Request for Reconsideration. (Tr. 179–84, 209–15). Plaintiff subsequently requested a hearing before an Administrative Law Judge ("ALJ").

ALJ Jeffrey Hart (the "ALJ") conducted an administrative hearing on January 9, 2015, at which Plaintiff, as well as, an independent vocational expert, Norman A. Mastbaum ("IVE Mastbaum"), testified. (See, Tr. 74–103).

On April 15, 2015, the ALJ issued a decision denying Plaintiff's applications for benefits, in which he concluded that Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. 7–21).[4] Plaintiff sought review of the decision by the Appeals Council. (See, Tr. 1). On

---

[2] Throughout this Report and Recommendation, the Court refers to the Administrative Record, [Docket No. 14], by the abbreviation "Tr."

[3] Plaintiff previously filed applications for Title II and Title XVI benefits on January 11, 2008, and December 19, 2007, alleging a disability onset date of June 4, 2007. (Tr. 108). Those applications were denied on initial review, upon reconsideration, and by Administrative Law Judge Larry Meuwissen. (Tr. 108–16). Plaintiff was represented by counsel at that previous administrative hearing. (Tr. 108).

[4] The ALJ issued his original decision on March 30, 2015. (Tr. 40). However, on April 15, 2015, the ALJ reissued his decision correcting an error in the procedural history of his prior decision. (See, Tr. 7). The ALJ's original decision provided that Plaintiff's application for Social Security Income was denied at the initial determination

May 16, 2016, the Appeals Council denied Plaintiff's request for review. (Tr. 1–3). As such, the ALJ's April 15, 2015, decision became the final decision of the Commissioner. See, 20 C.F.R. §§ 404.981, 416.1481.

On June 20, 2016, Plaintiff filed the present action. (Compl. [Docket No. 1]).

### B.    Factual History

Plaintiff was born on August 12, 1958. (Tr. 265). He has at least a high school education and can communicate in English. (Tr. 318, 320). In his application for benefits, Plaintiff represented that his ability to work was limited by osteoarthritis, back injury, depression, and anxiety. (See, Tr. 120, 319).

In an undated Work History Report, Plaintiff indicated that he held various previous positions of employment including that of a dispatcher from January 2007 until June 2007, from January 2000 until January 2004, and for all of 1996; operations manager from January 1990 until January 1996 and from January 1976 until January 1989; truck driver from August 1997 until November 2005; and aircraft maintenance worker in the Unites States Air Force from August 1974 until August 1976. (Tr. 296). In an undated Disability Report, Plaintiff indicated that he worked as a truck driver or dispatcher from March 1997 until May 2007. (Tr. 320). In an updated Work Background Report received by the Social Security Administration on August 6, 2014, Plaintiff indicated that he worked as a property manager for James Getzbow from about June 2008 until October 2009, as well as, as a dispatcher and over the road truck driver for various truck driving companies from June 1999 until around June 2008. (Tr. 393).[5]

---

level, as well as, upon reconsideration; however, as noted above, Plaintiff's application for Social Security Income was in fact approved at the initial determination level and the reconsideration level. (Tr. 7). The ALJ's April 15, 2015, decision reflects the correct procedural history, and as revised, the ALJ's April 15, 2015, decision became his final decision.

[5] The June 2008 and October 2009 dates appear to be approximations as they are proceeded on the form by question marks. (Tr. 393).

In a Function Report completed by Plaintiff on April 12, 2013, he indicated that he lacked the memory capacity to complete simple tasks, including personal care tasks and taking his medication; stayed in bed most of the day drinking coffee and waiting for his wife to get home; and lacked energy, in part, due to his inability to sleep longer than a few hours because of his anxiety. (Tr. 330–34) Plaintiff also wrote that he prepared his own simple meals, such as sandwiches, ramen noodles, and cereal; performed light cleaning and laundry once a week; went grocery shopping with his wife on a regular basis; and visited his children twice a month; however, Plaintiff wrote that he does not drive because he sometimes forgot where he was going. (Tr. 335). Regarding his ability to handle money, Plaintiff wrote that he was able to pay bills and count change, but he did not handle a savings account or use a checkbook. (Tr. 335). Plaintiff also indicated that he had no hobbies, but he sometimes read and watched television. (Tr. 336). Plaintiff also indicated that his alleged disability affected his ability to lift, squat, bend, stand, sit, remember, complete tasks, concentrate, understand, and get along with others. (Tr. 337). Plaintiff wrote that he could walk two or three blocks; could concentrate for short periods of time; and could generally follow simple, written instructions. Plaintiff also indicated that he did not handle stress well, was set in his ways, did not get along with authority figures, and found it hard to change. (Tr. 338).

Plaintiff completed another Function Report on November 7, 2013, which largely mirrors his April 12, 2013, Function Report but with some notable exceptions. (Tr. 358–65). In his November 7, 2013, Function Report, Plaintiff wrote that he was in constant back pain which limited his ability to do even the simplest tasks, that he slept very little due to his anxiety, and that he had trouble remembering to do certain tasks such as taking his medication. (Tr. 358–60). Plaintiff indicated that he no longer prepared meals; however, Plaintiff also indicated that he did

4

light cleaning and laundry twice a week. (Tr. 360). While Plaintiff indicated that he had stopped mowing the lawn due to leg pain and numbness, he also indicated that he drove a car. (Tr. 361). Moreover, Plaintiff indicated that he was able to pay bills, count change, and handle a savings account. He also indicated that he follows written instruction "fairly well," and his ability to follow spoken instructions depended on the situation. (Tr. 363). While Plaintiff continued to indicate that he did "not play well with others," he also indicated that he handled stress "fairly well." (Tr. 364).

At the administrative hearing, Plaintiff testified that the last time he worked was for between six to nine months in 2010 managing rental properties. (Tr. 76–77, 94).[6] Plaintiff testified that he had some secondary education in the business field, but he, at least partially, learned the property manager position on the job. Plaintiff testified that the position was part-time for him because the property owner gave him "the run of everything," including not supervising him and letting him be "the property manager period." (Tr. 94). Plaintiff managed twenty single family homes, twenty-two mobile homes, and one eight-unit apartment building. (Tr. 94–95). Plaintiff also supervised three individuals. (Tr. 94–95). Plaintiff testified that his hours varied between twenty to forty hours a week for which he was paid $250 in cash per week. (Tr. 95–96). Plaintiff testified that his duties as property manager included collecting rent, preparing leases, and showing properties, as well as, "paperwork and legal stuff." (Tr. 95–96). At the same time Plaintiff was working as a property manager, Plaintiff testified he was also working as a truck dispatcher. (Tr. 98). Plaintiff further testified that his property manager job ended when he began arguing with the property owner over certain rental practices the owner employed which Plaintiff perceived as illegal. (Tr. 77–78). Plaintiff also testified that he was in

---

[6] Plaintiff's Earnings Reports do not reflect this employment. (See, Tr. 286–93). Plaintiff's reported earnings in 2010 and 2009 only included employment with Centra Sota Cooperative for which Plaintiff was paid $48.00 in 2010 and $2,632.68 in 2009. (Tr. 287).

the U.S. Air Force in 1974 or 1975 when he was stationed in Laos, that he used to own tractor trailer trucks, and that he drove trucks for other companies, including Bjorkland Trucking, Inc., the latter being a position from which Plaintiff was fired three times. (Tr. 87–89, 96–97).

Plaintiff averred that he could no longer work because he had trust issues; that he wanted to stay at home; that he was opinionated; and that he didn't get along well with other people, including getting into arguments with judges. (Tr. 78–79). Plaintiff described a close quarters screaming argument he had with an unnamed judge in that judge's chambers. (Tr. 79). Plaintiff also described various legal actions he had pursued in state and federal court with satisfactory results. (Tr. 79–81).

Plaintiff testified that his neck and lower back issues would prevent him from working a full time job. (Tr. 82). Plaintiff clarified that his ability to stand or sit depended on the situation. (Tr. 82). Plaintiff was unsure if these issues prevented him from doing any work, but he thought they prevented him from doing any work for which he was trained. He testified that he could lift between twenty-five and thirty pounds, but that his back and neck were wearing out. Plaintiff also testified that he agreed with Dr. Norstand's orthopedic report. (Tr. 82–83).

Regarding his mental health impairment, Plaintiff testified that he generally did not get along with others especially authority figures, and he had anxiety. (See, Tr. 84–85). Plaintiff testified that he had been treated at Veterans Affairs for anxiety since either 2008 or 2009. (Tr. 84–85).

Upon further questioning by the ALJ, Plaintiff testified that he "got sober" in 1993, and he had not used marijuana in "[a] long time . . . quite a while . . . probably months." (Tr. 85). He stopped using it to control his pain when his doctor told him he should stop using it until it becomes legal. (Tr. 86). Plaintiff also testified that he lost his driver's license in 2010 when

police officers in Missouri found marijuana in his vehicle. (Tr. 88–89). Plaintiff averred that the marijuana was left in the vehicle by "one of [his] drivers." (Tr. 88).

### C.    Medical Evidence in the Record

The record indicates that between November 21, 2007, and November 16, 2013, Plaintiff saw a chiropractor twenty-one times at Kimball Chiropractor. (Tr. 532–34). Plaintiff saw the chiropractor twice in 2007, four times in 2008, three times in 2010, and twelve times in 2013 with zero appointments in 2009, 2011, or 2012. (Tr. 532–34). The notes from these appointments are minimal and consist of only a few words per appointment. (Tr. 532–34). On November 21, 2007; December 1, 2008; September 116, 2013; and October 23, 2013, Plaintiff reported improvement in his pain. (Tr. 532–34).

From October 21, 2011, to October 24, 2011, Plaintiff was admitted to an inpatient psychiatric unit for mental health treatment after he stopped taking his antidepressant, Citalopram, for three weeks. (Tr. 421–22, 456). Upon admittance, Plaintiff reported that the last time he was employed was "the beginning of 2011" as a truck driver. (Tr. 453). Plaintiff reported having thoughts of suicide, having no appetite, and feeling depressed. (Tr. 422). Upon examination, Plaintiff was observed to be somewhat despondent, but he was deemed ready to engage in conversation with good insight and judgment. (Tr. 422).

During his October 2011 hospitalization, Plaintiff also met with staff psychiatrist Dr. Shashi Prakash, M.D., on at least two occasions. (Tr. 458–60). In the treatment notes for those sessions, Dr. Prakash noted that a review of Plaintiff's records revealed Plaintiff started seeing a Depression TIDES case manager in early 2009,[7] that they had been following Plaintiff closely, and that Plaintiff had been doing "fairly well on Citalopram and Trazodone which Dr. Luedtke

---

[7] The record does not explain what Depression TIDES is, and there are no mental health records from any case manager from 2009 or 2010 in the current administrative record.

had been prescribing" until three weeks prior when Plaintiff stopped taking the Citalopram and started feeling more depressed. (Tr. 459). Plaintiff was diagnosed with depression not otherwise specified and recently decompensated with medication noncompliance. (Tr. 460).   Upon discharge, Plaintiff reported that he no longer felt depressed or suicidal while taking his new medication, that he was able to think "unfettered," and that his new medicine was already working. (Tr. 422, 456). During this October 2011 hospital stay, Plaintiff was prescribed Sertraline to treat his depression. (Tr. 421–22).

On November 14, 2011, Plaintiff met with registered nurse Charles D. Kalkman for "supportive talks and direction." (Tr. 447–49). While Plaintiff reported that he was feeling depressed and not sure if his medication was working, he also reported that he had been getting some exercise cutting firewood. (Tr. 448). Plaintiff again met with RN Kalkman on December 15, 2011, for a thirty minute appointment for "supportive talks and direction." (Tr. 444–46). Plaintiff reported that he felt his depression medication was working to keep him stable, specifically noting that the medication was making him feel less depressed and helping him think. (Tr. 445). He also reported that he was doing everything to find work; however, Plaintiff declined to be referred to Veterans Affairs Vocational Rehab Services. (Tr. 445).

Between November 21, 2011, and March 22, 2012, Plaintiff met with social worker Peggy L. Traux, M.S.W., L.I.C.S.W, on four separate occasions for individual counseling. (Tr. 435–447). At each appointment after his initial appointment, Plaintiff reported that things were getting better. (Tr. 435–47). At the March 22, 2012, appointment, Plaintiff reported that things were "going good;" that he was managing his depression better; that he was feeling better overall, including feeling more productive, more purposeful, and less hopeless; that he was taking control of his life; and that he was getting better. (Tr. 435–36).

On February 2, 2012, Plaintiff had a thirty minute medication management and supportive psychotherapy appointment with Clinical Nurse Specialist Robin L. Johnson, C.N.S. (Tr. 441–43). While Plaintiff reported some decreased energy, he also reported improvement in his mood with medication and a good appetite. (Tr. 441). Plaintiff was observed as being cooperative with normal speech tone and rhythm, as well as, having a bright mood, a full range of affect, a good general fund of knowledge, and unimpaired judgment and insight. (Tr. 443). Plaintiff was instructed to—and agreed to—return to see CNS Johnson in three months. (Tr. 443).

On January 31, 2013, Plaintiff had a chest x-ray and a spinal imaging completed. (Tr. 423–24). The chest x-ray indicated a normal cardiac silhouette, as well as, normal mediastinal contours and pulmonary vessels. (Tr. 423). The spinal imaging indicated a moderate multilevel degenerative spondylosis lumbar spine. (Tr. 424).

On January 31, 2013, Plaintiff also presented to Dr. Warren H. Luedtke, M.D., for his one year review of his ongoing health concerns. (Tr. 430–32). Plaintiff reported only some achiness in his lower back, and he reported that he tried to walk daily. (Tr. 430–31). Plaintiff denied any specific back or joint pain, and instead, complained of a general achiness in his legs at the end of the day, as well as, occasional nocturnal cramps. (Tr. 431). Plaintiff was instructed to return in one year's time, and to continue to follow up with the mental health staff regarding his depression and anxiety. (Tr. 432).

On February 5, 2013, Plaintiff had a thirty minute medication management and support psychotherapy appointment with CNS Johnson. (Tr. 427–29). CNS Johnson noted that Plaintiff was last seen in the mental health clinic on February 2, 2012, with an order to return three months later; however, Plaintiff chose not to make that return appointment. (Tr. 427–28). On

February 5, 2013, Plaintiff reported being independent in performing household chores, shopping, taking his medications, and making and keeping his own appointments. (Tr. 427). He also reported that he was feeling increased stress due to a lack of an income, and he reported that he had been unemployed since March 2011, when he had been employed as a truck driver. (Tr. 427). During the appointment, CNS Johnson observed that Plaintiff was neatly dressed; was cooperative with normal speech tone and rhythm; and had normal thought content and a neutral mood, as well as, a full range of affect, a neutral mood, a good general fund of knowledge, good eye contact, and reality based judgment and insight. (Tr. 429). CNS Johnson noted that Plaintiff had a diagnosis of depressive disorder not otherwise specified. (Tr. 429). CNS Johnson discussed with Plaintiff his medicinal noncompliance, instructed him to continue taking his Sertraline to treat his depression, and prescribed alprazolam to treat Plaintiff's anxiety. (Tr. 427–28).

On June 24, 2013, Plaintiff met with Dr. D.M. Van Nostrand, M.D., for a Social Security orthopedic examination. (Tr. 482–85). Dr. Van Nostrand noted that Plaintiff reported visiting a chiropractor a number of times. (Tr. 482–83). When Dr. Van Nostrand spoke with Plaintiff about his activates of daily living, Plaintiff reported that he was able to do his own bathing and dressing without any help except for occasional help with his socks and boots; could lift 50 pounds, stand or sit for 30 minutes, walk for half a mile, mow his lawn with a self-propelled lawn mower, climb stairs several times a day, and crawl around on his hands and knees; and drove a vehicle an average of 30 miles per day. (Tr. 483). Plaintiff noted that he then had a young relative currently mowing the lawn, and he was worried he may not be able to do it in the future. (Tr. 483). Plaintiff also reported that a hot bath helped his symptoms "a great deal." (Tr. 483).

Dr. Van Nostrand observed that Plaintiff's handling, reaching, fingering, seeing, hearing, and speaking were all normal. (Tr. 483). Upon physical examination, Dr. Van Nostrand observed Plaintiff's lateral flexion was 40/45 degrees left and 20/45 degrees right; Plaintiff's neck flexion was 30/30 degrees with neck extension at 25/30 degrees and rotation at 70/80 degrees left, as well as, 50/80 degrees right; Plaintiff's Spurling's test was positive (more on the right than the left); and Plaintiff had a spasm in the sternocleidomastoid muscle, the trapezius muscles, and the paracervical muscles. (Tr. 484). Dr. Van Nostrand also observed that Plaintiff had a normal straight leg raise test, a normal range of motion in the shoulder, and was able to heel-toe walk without difficulty. (Tr. 484). Dr. Van Nostrand diagnosed Plaintiff with lumbar pain syndrome with radiculopathy and cervical pain syndrome with radiculopathy. (Tr. 485). Dr. Van Nostrand concluded that Plaintiff's physical examination was "quite good," specifically noting that there was no evidence of fatigue or muscle weakness, and repetitive activity was apparently unremarkable. (Tr. 485).

On July 18, 2013, Plaintiff presented to licensed psychologist Dennis O. Andersen, M.A., L.P., for a consultative psychological evaluation on referral from the Minnesota Disability Determination services. (Tr. 488–93). Plaintiff reported that he drove himself to the appointment, and he relayed his symptoms and history to LP Andersen. (Tr. 488–91). Plaintiff knew the current date, as well as, past and current presidents; was able to count backwards; correctly recalled eight items forward on a digit span with one error, as well as, five items in reverse with one error; and on a memory task, recalled all three items immediately at both five minutes and thirty minutes. (Tr. 491). However, Plaintiff was not able to offer any interpretation of the proverb "Strike while the iron is hot," and he was not able to accurately count completely in a serial of sevens. (Tr. 491). LP Andersen reported that Plaintiff sat quietly, maintained good eye

contact, and was reasonably friendly; was cooperative; recognized the social requirements of interchange; maintained adequate attention and concentration; understood what was happening; exhibited mild anxiety; did not appear to be significantly depressed or in any substantial psychiatric distress; and exhibited nothing to suggest significant characterological issues. (Tr. 489–90). LP Andersen opined that Plaintiff had adequate attention and concentration; a mild anxiety disorder not otherwise specified; a somewhat diminished rate and pace; possible judgment issues; major depressive episodes; a likely limited ability to cope with stressful environments; and the ability to handle his own financial arrangements. (Tr. 492–93). LP Andersen assessed with a GAF score of 57. (Tr. 493).

On July 24, 2013, state agency consultant Dr. Murari Bijpuria, M.D., reviewed Plaintiff's medical records in regards to Plaintiff's physical impairments for the initial review of Plaintiff's Social Security disability insurance benefits claim. (Tr. 125–26). Dr. Bijpuria concluded that Plaintiff's medically determinable impairments could not reasonably be expected to produce Plaintiff's alleged pain and symptoms as there was insufficient evidence of a medically determinable orthopedic impairment to cause the pain alleged by Plaintiff. (Tr. 128). On August 15, 2013, state agency psychologist consultant Dr. Jeffrey Boyd, Ph.D., L.P., reviewed Plaintiff's medical records in regards to Plaintiff's mental impairments for the initial review of Plaintiff's disability insurance claim. (Tr. 127). Dr. Boyd performed a psychiatric review technique (PRT) for the time period between January 29, 2010, and June 30, 2010, and he concluded that Plaintiff had no severe impairments reasoning that there was insufficient evidence to substantiate the presence of a disorder. (Tr. 127). After considering Dr. Bijpuria's and Dr. Boyd's opinions, disability adjudicator Bob Stratton found Plaintiff not disabled in regards to his disability insurance benefits claim. (Tr. 128–29).

Dr. Bijpuria and Dr. Boyd also reviewed Plaintiff's medical records for the initial review of Plaintiff's social security income claim. (Tr. 130–44). Dr. Bijpuria's analysis and conclusion mirrors his findings under Plaintiff's disability insurance benefits claims. (Tr. 133–37). Dr. Boyd's findings vary somewhat from his previous finding under Plaintiff's disability insurance benefits claim. Dr. Boyd concluded that Plaintiff's medically determinable mental impairments included an affective disorder and an anxiety disorder. (Tr. 137).  Dr. Boyd concluded that Plaintiff's mental impairments produced mild restrictions to his activities of daily living; moderate restrictions to his social functioning, as well as, his ability to maintain concentration, persistence, and pace; but no episodes of decompensation of extended duration. (Tr. 137).

Dr. Boyd concluded that Plaintiff's mental impairments moderately restricted his ability to carry out detailed instructions; to maintain attention and concentration for extended period of time; to complete a normal work day and work week without interruptions from psychologically based symptoms; to interact appropriately with the general public; to accept instruction and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting. (Tr. 141). Dr. Boyd noted that he gave careful consideration to Plaintiff's statements regarding his alleged symptoms and the alleged affect those symptoms had on Plaintiff's functioning. (Tr. 141–42). After considering Dr. Bijpuria's and Dr. Boyd's opinions, disability adjudicator Bob Stratton found Plaintiff to be disabled in regards to his social security income claim with an established onset date of August 11, 2013, noting that it was the based on Plaintiff's "age, education, work history, and RFC assessment" and his "allowance at age 55." (Tr. 143).

On July 26, 2013, upon self-referral, Plaintiff presented to the Interventional Pain and Physical Medicine Clinic where he saw Vincent D. Miles, PSYD, and Dr. Thomas C. Kowalkowski, D.O. (Tr. 504–20). Plaintiff reported that he was not then currently using any medication for his back pain nor had he sought any treatment for his pain, and he was observed to be in a good mood and cooperative. (Tr. 506, 513). Plaintiff's lumbar spine MRI showed mild degenerative disc disease at moderate spondylosis in a background of mild dexotroscoliosis. (Tr. 525). Plaintiff's cervical spine MRI showed degenerative disc disease and spondylosis with multifocal mild to moderate foraminal and mild canal stenosis. (Tr. 525). Dr. Kowalkowski performed a lumbar medial branch block bilaterally upon Plaintiff in an effort to relieve Plaintiff's lower back pain. (Tr. 508). Before the procedure, Plaintiff rated his pain at fifty out of one hundred; however, after the procedure, Plaintiff rated his pain at a zero out of one hundred. (Tr. 509).

On August 2, 2013, Plaintiff saw CNS Johnson for a thirty minute medication management and supportive psychotherapy appointment regarding Plaintiff's depression. (Tr. 498–500). At that appointment, CNS Johnson noted that Plaintiff would continue his current antidepressant as he reported them helpful in decreasing his depressive symptoms. (Tr. 498). Plaintiff also reported that his Flamingo Light—full spectrum light therapy—for treating his depression had been having a satisfactory impact. (Tr. 499). Plaintiff was observed as cooperative with normal speech tone and rhythm, a neutral mood, a full range of affect, a good general fund of knowledge, and reality based judgment and insight. (Tr. 449).

On August 9, 2013, Plaintiff presented to the Interventional Pain and Physical Medicine Clinic where he saw Vincent D. Miles, PSYD, and Dr. Thomas C. Kowalkowski, D.O., for follow-up appointments, as well as, a second diagnostic lumbar medial branch block. (Tr. 520–

29). Plaintiff reported that he received relief from the previous lumbar medial branch block, and specifically noted an 85% improvement after the first procedure. (Tr. 524, 528). Plaintiff's right knee MRI showed a minimal osteoarthritis of the knee affecting the patellofemoral and medial tibiofemoral joint compartments, a small knee joint effusion, a Baker's cyst, a small vertical tear of the anterior horn lateral meniscus, and a small meniscal cyst adjacent to the anterior horn. (Tr. 55). Before the second branch block procedure, Plaintiff rated his pain at fifty out of one hundred, and after the procedure, Plaintiff rated his pain at a ten out of one hundred. (Tr. 509).

On November 26, 2013, state agency medical consultant, Dr. Cliff M. Phibbs, M.D., reviewed Plaintiff's medical records in regard to Plaintiff's physical impairments, and he largely affirmed Dr. Bijpuria's previous conclusion that Plaintiff's medically determinable impairments could not reasonably be expected to produce Plaintiff's alleged pain and symptoms as there was insufficient evidence of a medically determinable orthopedic impairment to cause the pain alleged by Plaintiff. (Tr. 156–60, 168–72). On that same date, state agency psychological consultant Dr. Russell J. Ludeke, Ph.D., L.P., reviewed Plaintiff's medical records in regard to Plaintiff's psychological impairments, and he materially affirmed Dr. Boyd's previous conclusion in relation to the disability insurance claims that a psychiatric review technique (PRT) for the time period between January 29, 2010, and June 30, 2010, showed no severe impairments as there was insufficient evidence to substantiate the presence of a disorder, as well as, Dr. Boyd's previous conclusion in relation to the social security income claim that Plaintiff's medically determinable mental impairments included an affective disorder and an anxiety disorder. (Tr. 154–56, 173–74). Based on the opinions of Dr. Phibbs and Dr. Ludeke, disability adjudicator Kara Davis affirmed the finding that Plaintiff was not disabled in relation to his claim for social security disability insurance benefits and the finding that he was considered

15

disabled the day after he became 55 years of age in relation to his claim for social security income. (Tr. 160, 176).

On January 2, 2014, Plaintiff presented to the Litchfield emergency room where he was diagnosed with acute inferior ST elevation myocardial infarction, and he was transferred to Centra Care Health. (Tr. 544). Upon arrival at Centra Care Health, Plaintiff underwent emergent cardiac catheterization that identified an occluded right artery. (Tr. 544). The vessel "was successfully revascularized with the placement of a drug eluting stent producing excellent angiographic result." (Tr. 544). After monitoring, Plaintiff was discharged on January 4, 2014, and he was instructed to follow up with his primary doctor in one to two weeks, as well as, follow up with the Heart Center in one to three months. (Tr. 543).

Plaintiff met with CNS Johnson on January 28, 2014, for another thirty minute medication management and supportive psychotherapy appointment. (Tr. 638–41). Plaintiff reported that he was satisfied with the efficacy of his Sertraline in treating his depression, and although he only used it sparingly, he also reported being satisfied with his Alprazolam in treating his anxiety. (Tr. 639). He also reported being satisfied with the impact of his Flamingo light therapy. (Tr. 639). CNS Johnson observed that Plaintiff made good, direct eye contact; was cooperative; had normal speech tone and rhythm; oriented times three; had a neutral mood with reality based judgment and insight; had a full range of affect; and had a good general fund of knowledge. (Tr. 640). CNS Johnson noted the continued diagnosis of depression disorder not otherwise specified, and she noted an additional diagnosis of cannabis abuse, episodic use. (Tr. 640).

On March 19, 2014, Plaintiff met with Dr. Mai Kong Xiong, M.D., for an annual follow up appointment. (Tr. 633–37). Plaintiff reported that while he had some relief from the previous

injections into his back, he felt the pain was worsening again. (Tr. 634). Plaintiff also reported that he was walking a quarter of a mile to remain active, and he had recently done some light shoveling. (Tr. 634). Upon examination, Dr. Xiong noted that Plaintiff's heart rate was regular for rate and rhythm. (Tr. 635). Dr. Xiong also reported that Plaintiff was able to move from the chair to the exam room without any difficulty, had good strength and reflexes preserved with symmetric bilateral patellar, and he complained of pain in the back of his knees. (Tr. 635). Dr. Xiong encouraged Plaintiff to reestablish his cardiac rehab appointments and to exercise. (Tr. 636). Dr. Xiong referred Plaintiff to a yoga program. (Tr. 636).

On March 27, 2014, Dr. Mathew Caffery, M.D., M.P.H., in a pain consultation letter to Dr. Xiong, recommended intermittent use of naproxen 500 mg with occasional acetaminophen 500–1000 mg and ongoing chiropractic care with the consideration of an acupuncture referral, as well as, yoga. (Tr. 578).

On April 3, 2014, Plaintiff underwent a sleep study which indicated he had obstructive sleep apnea. (Tr. 582–83). Plaintiff was provided with a CPAP machine, and he was instructed in its use. (Tr. 582–83).

On May 20, 2014, Plaintiff had a psychiatric interview at Veterans Affairs at which he was found to be alert, oriented times three, and cooperative with intact insight and judgment. (Tr. 587). Plaintiff was also observed to have a neutral mood with poor eye contact, but he did ambulate to the appointment with a steady gait. (Tr. 587). Plaintiff reported continued neck and back pain, but he also reported that a massage or hot soak helped (Tr. 585–86). He said he was to start attending yoga soon. (Tr. 585–86). At a medication treatment evaluation on May 20, 2014, Plaintiff denied any insomnia or fatigue. (Tr. 625).

On February 25, 2015, Plaintiff met with CNS Robinson for a thirty minute medication management and supportive psychotherapy appointment regarding Plaintiff's depression. (Tr. 607–09). CNS Johnson noted that Plaintiff had not been seen in the Mental Health Clinic since January 28, 2014. (Tr. 607). Plaintiff reported that he was feeling "good physically," and he denied any pain. (Tr. 607–08). Plaintiff also reported that he often forgot to take his medication or refill it when he ran out. (Tr. 607). CNS Johnson reported that Plaintiff made good, direct eye contact; was cooperative; had normal speech tone and rhythm; oriented times three; and had a neutral mood with reality based judgment and insight, a full range of affect, and a good general fund of knowledge. (Tr. 609).

### D.    Hearing Testimony and Statements

At the January 9, 2015, administrative hearing, the ALJ took testimony from Plaintiff and an independent vocation expert ("IVE"), Norman Mastbaum. Before the ALJ took testimony from Plaintiff, the ALJ discussed with Plaintiff his decision to represent himself and the exhibits in the present case. Plaintiff singed a "Decision to Proceed Without Representation" form, the ALJ explained Plaintiff's right to be represented. (Tr. 69–70). Plaintiff stated that he still wished to proceed without representation, and he noted that he had previously met with a representative, but he decided not to retain that representative. The ALJ offered to have the hearing rescheduled for another date to give Plaintiff another chance to meet with a representative to discuss Plaintiff's case and whether it should proceed to a hearing; the ALJ explained that to proceed forward with the hearing offered the risk that the ALJ could disagree with the Social Security Administrations finding regarding Plaintiff's application for Social Security Income—meaning that he would lose those benefits. (Tr. 71–72). Plaintiff stated that an attorney he previously met with explained that to him, and he understood he could lose that benefit, but he wished to

proceed forward. (Tr. 72). The ALJ accepted Plaintiff's decision to represent himself, found that the decision was knowing and voluntary, and he began discussing the exhibits in the present case with Plaintiff.

The ALJ asked Plaintiff if he had an opportunity to review the proposed exhibits, and if he objected to any of the exhibits. Plaintiff stated that the only problem he had was with Judge Meuwissen's findings and conclusions in Plaintiff's previous administrative hearing arguing that those findings and conclusions were prejudicial. (Tr. 73–74). Plaintiff specifically stated that he took issue with some of the statements Judge Meuwissen wrote regarding Plaintiff's credibility. (Tr. 74). The ALJ overruled Plaintiff's objection to the exhibit, admitted all the exhibits, and stated that he would give the previous ALJ decision "the weight that it's entitled to." (Tr. 74).

Plaintiff was then sworn in, and he testified as reported above in part I.B., supra. The ALJ also stated that he would leave the record open after the hearing for two weeks to allow Plaintiff to submit a written statement and to allow additional Veterans Affairs medical records to be acquired. (Tr. 75, 90–91). The ALJ provided Plaintiff with medical release forms so that the ALJ could request the additional Veterans Affairs medical records Plaintiff wished the ALJ to consider. (Tr. 91).

After the ALJ questioned Plaintiff, the ALJ began questioning IVE Mastbaum beginning with asking IVE Mastbaum to inform the ALJ if any answer he provided conflicted with the Dictionary of Occupational Titles. (Tr. 93–94). IVE Mastbaum offered testimony that he would add Plaintiff's past employment of property manager to his analysis, and he noted that it was a light exertional level, skilled position. (Tr. 98–99). IVE Mastbaum also stated that the positon had "transferable skills of management functions, such as supervision; money reconciliation, which, of course, deals with collecting of rents, et cetera; marketing of property; vendor

management; clerical functions; directing and coordinating activities of staff; [and] probably maintaining records." (Tr. 99).

The ALJ next questioned IVE Mastbaum regarding whether Plaintiff would be able to perform his past work by presenting IVE Mastbaum with a number of hypothetical questions. The ALJ asked IVE Mastbaum to assume for all of the hypotheticals an individual of Plaintiff's age and education. (Tr. 99). For his first hypothetical, the ALJ asked IVE Mastbaum if such a hypothetical person who could not work in excess of the medium exertional level would be able to perform Plaintiff's past relevant work. (Tr. 99). IVE Mastbaum opined that a hypothetical person with those restrictions and qualifications would be able to perform Plaintiff's past relevant work as a truck driver, as defined by the Dictionary of Occupational Titles; a dispatcher; and a property manager. (Tr. 99–100).

For his second hypothetical, the ALJ asked IVE Mastbaum to assume the same fact pattern as his first hypothetical with an additional restriction that the individual could not work in excess of the light exertional level, and then whether under this hypothetical, whether Plaintiff could perform his past relevant work. (Tr. 100). IVE Mastbaum opined that an individual with those restrictions and qualifications would be able to perform Plaintiff past work as a dispatcher and as a property manager. (Tr. 100). Upon further questioning by the ALJ, IVE Mastbaum opined that Plaintiff would be able to perform his work as a truck driver at the sedentary level as IVE Mastbaum had seen it performed, but he would not be able to perform it as defined by the Dictionary of Occupational Titles or at the heavy exertional level as Plaintiff had reportedly performed it. (Tr. 99–100).

For his third hypothetical, the ALJ asked IVE Mastbaum to assume the same fact pattern as his second hypothetical with an additional restriction that once every month the individual is

going "to have an inappropriate outburst towards or interaction with a supervisor," and then whether under this hypothetical whether Plaintiff could perform his past relevant work. (Tr. 101). IVE Mastbaum opined that an individual with those restrictions and qualifications would not be able to perform Plaintiff's past relevant work reasoning that this additional restriction would likely lead to immediate discharge. (Tr. 101). The ALJ did not inquire as to other jobs in the national economy a person as described in the third hypothetical would be able to perform.

Lastly, the ALJ asked Plaintiff if he had any questions for IVE Mastbaum, and Plaintiff stated that he did not have any questions. (Tr. 102). The ALJ concluded the hearing by reminding Plaintiff that the record would remain open for two weeks for Plaintiff's written statement, and that the Social Security Administration would be requesting additional medical records from Veterans Affairs which Plaintiff wanted the ALJ to consider.[8]

### E.    The ALJ's Decision

The ALJ ultimately held that Plaintiff had not been disabled within the meaning of the Social Security Act from January 29, 2010, through April 15, 2015, the date on which the ALJ issued his final decision. (Tr. 21).

As an initial matter, the ALJ determined that there was no basis upon which to reopen the determinations on the Plaintiff's prior applications. (Tr. 8).[9] The ALJ considered 20 C.F.R.§§ 404.988 and 416.1488, as well as, Social Security Ruling 91-5p, and he found that there was no basis upon which to reopen the previous determinations by ALJ Meuwissen. The ALJ noted that under the doctrine of res judicata the previous determinations were final and binding. (Tr. 8).

---

[8] These records were acquired, and they are a part of the administrative record as considered by the ALJ and as discussed in this Report and Recommendation. (See, Tr. 414). After the administrative hearing, Plaintiff filed two written responses both of which are a part of the administrative record as considered by the ALJ and as discussed in this Report and Recommendation. (See, Tr. 400–13).

[9] As noted above, Plaintiff previously filed applications for Title II and Title XVI benefits on January 11, 2008, and December 19, 2007, alleging a disability onset date of June 4, 2007. (Tr. 108). Those applications were denied on initial review, upon reconsideration, and by Administrative Law Judge Larry Meuwissen. (Tr. 108–16). Plaintiff was represented by counsel at that previous administrative hearing. (Tr. 108).

Accordingly, citing 20 C.F.R.§ 404.957(c)(1), the ALJ noted that Plaintiff's present application would "only consider the time from January 29, 2010, forward, or from the day after the last Administrative Law Judge decision regarding disability." (Tr. 8).

In reaching his decision on Plaintiff's present application for benefits, the ALJ followed the required five-step sequential analysis, namely: (1) whether the claimant had engaged in substantial gainful activity; (2) whether the claimant had a severe impairment; (3) whether the claimant's impairment met or equaled a listed impairment; (4) whether the claimant had sufficient residual functional capacity to return to her past work; and if not, (5) whether the claimant could do other work existing in significant numbers in the regional or national economy. (Tr. 11-21); 20 C.F.R. §§ 404.1520(a)-(f), 416.920.

At step one of the sequential analysis, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since January, 29, 2010. (Tr. 11); 20 C.F.R. §§ 404.1571, et seq.[10]

At step two of the analysis, the ALJ determined that Plaintiff had the following severe impairments: degenerative disc disease, osteoarthritis of the knee, obesity, and coronary artery disease. (Tr. 11); 20 C.F.R. §§ 404.1520(c) and 416.920(c). The ALJ also determined that Plaintiff's medically determinable mental impairments of chemical dependency, anxiety, and a depressive disorder not otherwise specified, considered alone or in combination, did not "cause more than minimal limitations in the [Plaintiff's] ability to perform basic mental work activities and are therefore nonsevere." (Tr. 11). The ALJ noted that the treatment record was "essentially silent as the [Plaintiff's] impairments prior to the expiration of his insured status in June 2010. (Tr. 12). The ALJ noted that the treatment record did "not demonstrate any significant functional

---

[10] The ALJ noted that while there was evidence that Plaintiff had engaged in "some work activity since the application date, it [was] not necessary to determine whether that work activity constitute[d] disqualifying substantial gainful activity because, even assuming that it was not substantial gainful activity, there exists a valid basis for denying" Plaintiff's applications, and "[i]t would not serve judicial economy to further delay the decision in order to develop the earnings." (Tr. 11).

impairment in any domain." (Tr. 12). In considering Plaintiff's mental impairments, the ALJ also noted that Plaintiff's Veterans Affairs mental health records failed to "suggest a significant pattern of treatment or objective evidence to support [Plaintiff's] subjective claim of disability." (Tr. 12).

The ALJ also considered the four broad functional areas set out in the disability regulations for evaluating mental disorders—known as the paragraph B criteria.

The ALJ evaluated the first of the Paragraph B criteria: Plaintiff's activates of daily living. (Tr. 12). The ALJ noted that portions of Plaintiff's self-completed Function Reports and testimony suggest substantial limitations, including vegetative symptoms of depression with a lack of activity and substantial time in bed, as well as, an inability to perform essential personal care tasks. (Tr. 12). However, the ALJ also noted that other self-reports by Plaintiff contradict his reports of substantial limitations. For example, the ALJ noted that Plaintiff reported that he does light cleaning and laundry, and the Veterans Affairs records indicated that Plaintiff is independent in performing household chores, including cooking, cleaning, laundry, and mowing the lawn; shopping; taking his medications; and making and keeping his own appointments. (Tr. 12). Overall, the ALJ determined that the record failed to establish any limitation in Plaintiff's activities of daily living that was attributable to mental impairment. (Tr. 12).

The ALJ next evaluated the second of the Paragraph B criteria: Plaintiff's social functioning. The ALJ determined that Plaintiff had mild limitations on his social functioning. (Tr. 12). The ALJ again noted that Plaintiff's self-completed Function Reports suggested substantial limitations in Plaintiff's social functioning; however, Plaintiff's other self-reports and testimony, as well as, the Veterans Affairs records contradict Plaintiff's Function Reports. (Tr. 12–13). Plaintiff worked as a property manager through the date last insured, testified that his

position as property manager required substantial interaction with other individuals, worked as dispatcher, testified that he has litigated at various levels with satisfactory results, and his Veterans Affairs records indicate "a generally full range of affect and an absence of behavioral abnormalities that are indicative of moderate or marked impairments as described later in metal status examination." (Tr. 12–13). The ALJ further noted that while Plaintiff's description of his litigious nature may be an indicator of a tension in relationships, it does not suggest that he is more than mildly impaired. (Tr. 12).

The ALJ then evaluated the third of the Paragraph B criteria: Plaintiff's concentration, persistence, and pace. The ALJ determined that Plaintiff had only mild limitations in this area. (Tr. 13). The ALJ noted that while Plaintiff self-reported he could not work because of memory impairment and substantial vegetative symptoms of depression with a lack of activity, he, had in actuality, worked through his date last insured as a property manager which the vocational expert identified as a skilled position, as well as, litigated at various levels of the Court, drove himself, and functioned in the community. (Tr. 13). Additionally, the ALJ noted that Plaintiff's "[m]ental status examinations with the exception of a consultative examination do not demonstrate significant cognitive impairment." (Tr. 13).

The ALJ then evaluated the fourth of the Paragraph B criteria: episodes of decompensation. (Tr. 13). The ALJ found that Plaintiff had experienced no episodes of decompensation that were of extended duration. (Tr. 13).

The ALJ also considered medical opinions with respect to Plaintiff's mental health functioning. (Tr. 13–14). The ALJ adopted Dr. Boyd's conclusion in Plaintiff's disability insurance claim that Plaintiff had no severe mental impairments noting that nothing in the record after Dr. Boyd's conclusion contradicts it, and the record contains no conflicting opinion for the

timeframe through June 30, 2010. (Tr. 13). As to Dr. Boyd's and Dr. Ludeke's consultative opinions of a severe mental health impairment with respect to Plaintiff's social security income application, the ALJ declined to give them significant weight reasoning that Plaintiff's subjective reports and his documented activities, including extensive litigation practice, were not consistent with such opinions. (Tr. 14). The ALJ also noted that other records which were not available to Dr. Boyd's and Dr. Ludeke's suggest a lesser level of mental health impairment.

At step three of the sequential analysis, the ALJ determined that Plaintiff's physical impairments considered, alone or in combination, did not meet or medically equal the severity of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically a major dysfunction of a joint under Listing 1.02; a disorder of the spine under Listing 1.04; or Listing 4.04A or 4.04B, concerning ischemic heart disease. (Tr. 14–15).

In concluding that Plaintiff's knee condition did not meet or medically equal a major dysfunction of a joint under Listing 1.02, the ALJ noted Plaintiff's MRI findings, as well as, the physical examinations of Plaintiff failed to support a listing level finding. (Tr. 14).

In concluding that Plaintiff's back impairments did not meet or medically equal a disorder of the spine under Listing 1.04, the ALJ noted that the record failed to provide sustained evidence of severely limiting neurological changes. (Tr. 14). The ALJ also noted that while there is some evidence of disorders of the spine in the record, there is no evidence that it resulted in compromise of a nerve root or the spinal cord, limitations of motions of the spine, motor loss with sensor or reflex loss, or lumbar spinal stenosis resulting in pseudo claudication. (Tr. 14).

In concluding that Plaintiff failed to meet the criteria of Listing 4.04A or 4.04B, concerning ischemic heart disease, the ALJ noted that the record lacked any evidence that Plaintiff had signs or symptoms of a limited exercise tolerance test meeting the prerequisite

criteria nor evidence of three separate ischemic episodes, each requiring revascularization or not amenable to revascularization, within a consecutive twelve month period. (Tr. 15).

Although obesity is not a listed impairment, the ALJ considered the disorder. (Tr. 15). In evaluating Plaintiff's obesity, the ALJ concluded that the evidence in the record, including diagnostic, imaging, and laboratory findings, was "not of such severity as found in any listing including those with frequency of treatment requirements (SSR 02-1p)." (Tr. 15).

At step four of the sequential analysis, the ALJ determine that Plaintiff had the residual functional capacity (RFC) to perform the full range of light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b). (Tr. 15).

In formulating Plaintiff's residual functional capacity, the ALJ employed a two-step process. (Tr. 15–20). First, the ALJ asked whether there was an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the Plaintiff's pain or other symptoms. (Tr. 15). Second, if an underlying physical or mental impairment that could reasonably be expected to produce the Plaintiff's pain or other symptoms was shown, the ALJ evaluated the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limited the Plaintiff's ability to work. (Tr. 15).

In making a credibility finding about Plaintiff's statements about the limiting effects of his impairments, the ALJ considered the record as a whole. (Tr. 15). The ALJ—consistent with 20 C.F.R. §§ 404.1529 and 416.929, as well as, SSRs 96-4p and 96-7p—also considered all of Plaintiff's alleged symptoms and whether they were consistent with the objective medical evidence and other evidence. (Tr. 15). The ALJ also considered opinion evidence in accord with 20 C.F.R. §§ 404.1527 and 416.927, as well as, SSRs 96-2p, 96-5p, 96-6p, and 06-3p. (Tr. 15).

Starting with the first prong of step four, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause his symptoms. (Tr. 16). At the second prong, the ALJ determined that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible. (Tr. 16).

The ALJ determined that given the objective medical evidence in the record, Plaintiff's course of treatment, Plaintiff's medication use, and Plaintiff's activities of daily living, the Plaintiff's statements regarding the severity and limiting effects of his impairments were not entirely credible. (Tr. 16–19). The ALJ noted that while the record shows some degenerative changes to the neck, back, and right knee that could reasonably be expected to restrict exertion, Plaintiff's gait and station are generally well preserved and he has normal muscle tone suggesting more activity than Plaintiff alleged. (Tr. 19). The ALJ also noted that Plaintiff's care had been conservative—including a lack of hospital admittances for physical impairments, a lack of significant number of emergency department or urgent care presentations, a lack of surgery, a lack of a prolonged course or physical or occupational therapy, and a lack of any comprehensive pain management program—suggesting a lesser degree of distress and impairment than alleged. (Tr. 19). The ALJ specifically noted that Plaintiff did not have any invasive pain management until 2013. The ALJ further noted that at times Plaintiff took no medications. (Tr. 20).

The ALJ observed that Plaintiff's reports to medical providers differed substantially from Plaintiff's claims of disability thus further reducing Plaintiff's credibility. The ALJ specifically noted Plaintiff's report to Dr. Van Nostrand's that Plaintiff could lift 50 pounds, stand or sit for 30 minutes, walk half a mile, and crawl on his hands and knees, as well as, reporting that in September 2014, he walked two to three hours daily and did heavy lifting. (Tr. 20). The ALJ further noted Dr. Van Nostrand's observations that Plaintiff's handling, reaching, fingering,

sight, hearing, speaking, and attention span were all normal. (Tr. 20). Plaintiff also reported to other medical providers that his stress management was improving, that he experienced substantial improvement in symptoms and function with the medial branch blocks, and that his energy increased with no loss of stamina or fatigue after his heart attack without any ongoing cardiac symptoms. (Tr. 20).

The ALJ also noted that Plaintiff's allegation of an inability to work was "significantly damaged by his testimonial admission" that he work for six to nine months in 2010 as a property manager for cash. (Tr. 20). The ALJ further noted that Plaintiff reported work activity for several decades after he left the military in the 1970s which—along with the income from property manager position—is not reported on Plaintiff's certified earnings records which he affirmed to be correct to the best of his knowledge. (Tr. 20). The ALJ averred that this raised "the question as to whether or not [Plaintiff] continues not to engage in disqualifying substantial gainful activity and it further diminishes assertions of a substantial decline in earnings capacity, i.e. disability, because of his alleged impairments." (Tr. 20).

The ALJ also considered the opinion evidence in the record.

The ALJ expressly gave limited weight to Dr. Bijpuria's opinion of medium exertion. (Tr. 20). The AJL noted that MRI findings and Plaintiff's heart attack after Dr. Bijpuria's opinion suggest a lesser exertional ability than that opined by Dr. Bijpuria. The ALJ expressly declined to adopt Dr. Van Nostrand's notes that Plaintiff repeatedly used the stairs in his residence and was able to crawl and kneel. (Tr. 20).

The ALJ concluded that the record as a whole supports the residual functional capacity (RFC) assessed which provided that Plaintiff had the residual functional capacity (RFC) to

perform the full range of light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b). (Tr. 20).

Relying on the testimony of the independent vocational expert, IVE Mastbaum, who opined that a hypothetical individual with Plaintiff's assessed residual functional capacity (RFC) would be able to perform Plaintiff's past work as a property manager as actually performed, the ALJ concluded that Plaintiff was able to perform his past relevant work as a property manager. (Tr. 20–21). The ALJ noted that Plaintiff's work as a property manager was performed within the last fifteen years at a substantial gainful activity level, and therefore, it was past relevant work.

Accordingly, the ALJ concluded that because Plaintiff could still perform his past relevant work Plaintiff was not disabled for the purposes of the Social Security Act regulations between January 29, 2010, and April 15, 2015, the date the ALJ issued his final decision. (Tr. 21).

## II.    STANDARD OF REVIEW

Congress imposed standards for determining whether a claimant is entitled to Social Security disability benefits. There are several benefits programs under the Act, including the DIB Program of Title II (42 U.S.C. §§ 401, et seq.) and the SSI Program of Title XVI (42 U.S.C. §§ 1381, et seq.). "Disability" means "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To be eligible for benefits, an individual's impairments must be of "such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age,

education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Judicial review of the Commissioner's decision to deny disability benefits is constrained to a determination of whether the decision is supported by substantial evidence in the record as a whole. Tellez v. Barnhart, 403 F.3d 953, 956 (8th Cir. 2005). Substantial evidence means more than a scintilla, but less than a preponderance. Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir. 2009). The substantial evidence test requires "more than a mere search of the record for evidence supporting the [Commissioner's] findings." Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (alterations in original) (quoting Gavin v. Heckler, 811 F.2d 1195 1199 (8th Cir. 1987)). Rather, the court "must take into account whatever in the record fairly detracts from its weight." Id. (quoting Universal Camera Corp. v. Nat'l Labor Relations Bd., 340 U.S. 474, 488 (1951)).

When reviewing the record for substantial evidence, the court may not reverse the Commissioner's decision simply because substantial evidence exists to support the opposite conclusion. Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984). Moreover, the Court may not substitute its own judgment or findings of fact for those of the ALJ. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). The court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989). After balancing the evidence, if it is possible to reach two inconsistent positions from the evidence and one of those positions represents the Commissioner's decision, the court must affirm the decision. Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). Thus, the court will not reverse the ALJ's "denial of benefits so long as the ALJ's decision falls within the 'available zone of choice.'" Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008).

The decision of the ALJ "is not outside the 'zone of choice' simply because [the Court] might have reached a different conclusion had [it] been the initial finder of fact." Id.

## III.    DISCUSSION

The parties have filed cross motions for summary judgment. [Docket Nos. 16, 22]. The arguments that Plaintiff makes in his *pro se* memorandum in support his motion consist mainly of generalized assertions that Plaintiff is entitled to benefits due to errors committed by the ALJ, including a perceived lack of evidence supporting the ALJ's factual and legal determinations. When Plaintiff's memorandum in support of his motion is construed liberally in his favor, Plaintiff appears to be arguing that: (1) the ALJ erred in finding that no basis existed to reopen the determination of Plaintiff's prior applications; (2) that the ALJ, due to his bias and prejudicial treatment of Plaintiff, failed in his duty to provide a non-adversarial hearing; and (3) that the ALJ's findings and conclusions were not supported by substantial evidence in the record.

The Commissioner contends that she is entitled to summary judgment, arguing that each of Plaintiff's arguments are unavailing and the ALJ's opinion is supported by substantial evidence in the record.  (See, Def.'s Mem. [Docket No. 23]).

### A.  Reopening of the Determination of Plaintiff's Applications

Plaintiff first contends that the ALJ erred in finding that no basis exists to reopen ALJ Meuwissen's determination of Plaintiff's prior applications for disability benefits.

A federal district court's jurisdiction to review the Commissioner's decision regarding disability benefits is governed by Section 405(g) of Title 42, which authorizes judicial review of "any final decision of the Commissioner . . . made after a hearing." See, Mason v. Barnhart, 406 F.3d 926, 964 (8th Cir. 2005).  Under § 405(g), courts generally lack jurisdiction to review the Commissioner's refusal to reopen the proceeding because a refusal to reopen the proceeding is not a "final decision of the Commissioner . . . made after a hearing." 42 U.S.C. § 405(g); see,

31

Califano v. Sanders, 430 U.S. 99, 107–08 (1977); Boock v. Shalala, 48 F.3d 348, 351 (8th Cir. 1995). Jurisdiction may exist, however, if Plaintiff challenges the refusal to reopen the proceeding on constitutional grounds. Califano, 430 U.S. at 109; Boock, 48 F.3d at 351. Jurisdiction may also exist in cases where the Commissioner "in denying a request for reopening an earlier application, nevertheless addresses the merits of that application" as the application is treated as having been "'constructively reopened' as a matter of administrative discretion." Boock, 48 F.3d at 351.

In the present case, Plaintiff has not proffered any constitutional claim upon which he challenges the ALJ's refusal to reopen the prior proceeding. As such, the Court lacks jurisdiction to review the refusal to reopen upon those grounds.

Plaintiff does appear to argue that the ALJ constructively re-opened the prior proceeding by discussing the medical evidence from before the date of the prior ALJ's opinion. This argument is unpersuasive. The "[m]ere consideration of evidence from an earlier application is not considered a reopening of the earlier claim." King v. Chater, 90 F.3d 323, 325 (8th Cir. 1996) (citing Boock, 48 F.3d at 352 n. 4). "Especially in the context of a progressive disease or degenerative condition, evidence that is offered as proof of a disability, and not found persuasive by an ALJ in a prior proceeding, may be considered in a subsequent proceeding in combination with new evidence for the purpose of determining if the claimant has become disabled since the ALJ's previous decision." Hillier v. Soc. Sec. Admin., 486 F.3d 359, 365 (8th Cir. 2007) (citation omitted). As such, the ALJ's consideration of evidence dated prior to ALJ Meuwissen's decision on Plaintiff's previous application for disability benefits alone does not constitute constructive reopening.

In his Reply Memorandum, [Docket No. 25], Plaintiff appears to argue that this jurisdictional threshold does not need to be met because the refusal to reopen his prior proceeding was made within the decision on his current applications over which the Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This argument is also unpersuasive. Courts considering the decision of an ALJ on a pending application for disability under 42 U.S.C. § 405(g) must still separately establish jurisdiction to consider a refusal to reopen a prior proceeding through one of the above mentioned exceptions. See, Mousseau v. Barnhart, 119 Fed. App'x 18, 20–21 (8th Cir. 2004) (unpublished); Britton v. Astrue, 622 F. Supp. 2d 771, 790 (D. Minn. 2008); Anderson v. Astrue, No. 6-cv-4270, (ADM/FLN), 2008 WL 542599, at *16 (D. Minn. Jan. 8, 2008).

Accordingly, the Commissioner's decision not to reopen Plaintiff prior proceeding regarding the previous denial of his application for benefits is not reviewable by this Court as it lacks jurisdiction.

### B. ALJ Neutrality

Plaintiff next argues that the ALJ failed in his duty to provide a non-adversarial hearing. In support of this argument, Plaintiff asserts that the ALJ was screaming and yelling to get responses during the administrative hearing, that the ALJ appeared upset and angry, and that the ALJ became furious when Plaintiff objected to an exhibit. (Plf.'s Mem., [Docket No. 17], at 4). Plaintiff also indicated that a courtroom monitor "warned" Plaintiff not to object very much before the ALJ because it would upset him. (Id.).

"ALJs and other similar quasi-judicial administrative officers are presumed to be unbiased." Perkins v. Astrue, 648 F.3d 892, 902–03 (8th Cir. 2011) (citing Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001); see also, Partee v. Astrue, 638 F.3d 860, 865 (8th Cir. 2011)

("There is a 'presumption of honesty and integrity in those serving as adjudicators.'")). A plaintiff bears the burden of producing sufficient evidence to overcome this presumption. See, Williams v. U.S. Dep't of Labor, 879 F.2d 327, 331 (8th Cir. 1989) (citing Ouachita Nat'l Bank v. Tosco Corp., 686 F.2d 1291, 1300–01 (8th Cir. 1982)). A plaintiff alleging bias on behalf of an ALJ is "required to show that the ALJ's behavior, in the context of the whole case, was 'so extreme as to display clear inability to render fair judgment.'" Rollins, 261 F.3d at 858 (quoting Liteky v. United States, 510 U.S. 540, 555–56 (1994)).

The Court first notes that Plaintiff has failed to establish that the ALJ was screaming or yelling during the administrative hearing or that the ALJ became angry during the administrative hearing. Plaintiff provides nothing other than his own conclusory assertions to support his claims that the ALJ was screaming or yelling during the administrative hearing or that the ALJ became angry during the administrative hearing. There is no indication of any of those actions in the transcript from the administrative hearing. (Tr. 69–103). In fact, the transcript demonstrates that the ALJ provided Plaintiff with an opportunity to reschedule the hearing and seek the advice of counsel, which Plaintiff declined, and the ALJ left the record open so Plaintiff could submit a written response if he wished (which he did ultimately do) and so additional medical records could be secured from Veterans Affairs—records which Plaintiff had indicated he requested but were not timely provided by Veteran Affairs. (Tr. 69–76, 91–92, 102–03).

Moreover, even if the ALJ appeared angry at the administrative hearing or his tone appeared to be an expression of anger, annoyance, or impatience, it is well established that those expressions "are within the bounds of what imperfect men and women sometimes display" and they do not establish bias. Perkins, 648 F.3d at 902–03 (citing Rollins, 261 F.3d at 858 (quoting Liteky, 510 U.S. at 555–56)). Plaintiff has failed to show that the ALJ displayed any behavior

rising to a level "so extreme as to display clear inability to render fair judgment." <u>Rollins</u>, 261 F.3d at 858.

Accordingly, the Court finds insufficient evidence of any bias on the part of the ALJ.

### C.  Substantial Evidence in the Record

Plaintiff next contends that the ALJ's findings and conclusions regarding the medical evidence in the record were not supported by substantial evidence. In reviewing whether an ALJ's findings and conclusions were supported by substantial evidence, the Court must search the record for evidence that contradicts the ALJ's findings and conclusions and it must give that evidence appropriate weight when determining whether the particular finding was within the allowable zone of choice. <u>Baldwin v. Barnhart</u>, 349 F.3d 549, 555 (8th Cir. 2003) (citing <u>Cline v. Sullivan</u>, 939 F.2d 560, 564 (8th Cir. 1991)).

In his written submissions to this Court, Plaintiff does not identify any specific fact that he contends was not supported by substantial evidence in the record; instead, Plaintiff merely highlights evidence which he believes supports his claim for disability, as well as, evidence he believes the ALJ improperly interpreted or failed to consider; and he takes issue with the ALJ's characterization of his previous employment as a property manager as past relevant work. Plaintiff contends that these errors and omissions demonstrate that the ALJ's decisions at steps two, three, and four were not supported by substantial evidence, and therefore, the ALJ's decision as a whole was also not supported by substantial evidence. Accordingly, the Court will examine the ALJ's findings and conclusions at steps two, three, and four of the sequential analysis.

1.  **Step Two – Medically Determinable Impairments**

Regarding Plaintiff's medically determinable mental impairments, the ALJ found that, considered alone or in combination, the impairments did not cause more than minimal limitations in the claimant's ability to perform basic mental work activities, and therefore, they were not severe. The ALJ based this conclusion on two material findings: (1) that the "[t]he treatment record [was] essentially silent as to [Plaintiff's] impairments prior to the expiration of his insured status in June 2010" and (2) the ALJ's evaluation of the four broad functional areas set out in the disability regulations for evaluating mental disorder.

Plaintiff asserts that the record was not silent as to the impairments and that the ALJ's consideration of the four broad functional areas was improper. Plaintiff contends that the record is not silent as to his medically determinable mental health impairments because Judge Meuwissen's prior decision on Plaintiff's previously denied application for benefits discussed mental health records, and therefore, the ALJ's decision is not supported by substantial evidence.

Plaintiff's argument is unpersuasive for at least two reasons. First, Judge Meuwissen's considered those medical records and found that Plaintiff had no medically determinable mental health impairments at that time—a decision which, as discussed above, the present ALJ did not reopen. (Tr. 110–11; Section III.A, supra). Moreover, Plaintiff failed to provide these prior records for consideration of the current application. (See, Tr. 1–658). Second, the record is silent as to any mental health treatment or impairment between Plaintiff's alleged onset date of January 29, 2010, and the expiration of his insured status in June 2010. (See, Tr. 1–658). The present record lacks any additional evidence regarding Plaintiff's medically determinable mental health impairments after Judge Meuwissen's decision and before the expiration of Plaintiff's insured status in June 2010. (See, Tr. 1–658).

In determining that Plaintiff's medically determinable mental health impairments were not severe, the ALJ considered the four broad functional areas set out in the disability regulations for evaluating mental disorder, and he determined that Plaintiff had no significant limitations in the area of activities of daily living; mild limitations in the area of social functioning, as well as, the areas of concentration, persistence, or pace; and no episodes of decompensation of extended duration. (Tr. 12–13). Plaintiff appears to argue that the ALJ misweighed the evidence in the record in making his determination and that other evidence in the record could support a finding that Plaintiff's had harsher limitations in the four broad functional areas than the limitations imposed by the ALJ.

To the extent that Plaintiff argues here that there was also other evidence in the record to support a finding that his medically determinable mental health impairments were severe or that the ALJ's findings of fact in consideration of those impairments were incorrect, the Court may not reverse the ALJ simply because some other substantial evidence might support the opposite conclusion. See, Milam v. Colvin, 794 F.3d 978, 983 (8th Cir. 2015). Nor may the Court substitute its own judgment or findings of fact for those of the ALJ. See, Woolf, 3 F.3d at 1213. Instead, the Court "must consider evidence that both supports and detracts from the ALJ's decision," and "must affirm the denial of benefits if 'it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings.'" See, Milam, 794 F.3d at 983 (citations omitted). Such is the circumstance in the present case.

Here, Plaintiff merely highlights favorable evidence which was already considered by the ALJ, and he offers his interpretation of the evidence considered by the ALJ. Essentially, Plaintiff asks the Court to reweigh the evidence, which under the applicable standard of review, the Court may not do.

Substantial evidence in the record as a whole does support the ALJ's determination that Plaintiff's medically determinable mental health impairments caused no more than mild limitations, and they were, therefore, not severe. When Plaintiff was medicinally compliant he reported no longer feeling depressed, he reported being satisfied with his medication in treating his depression, and in several instances, he reported feeling better. (Tr. 422, 435–47, 441, 445, 456, 498–99, 639). When Plaintiff did report feeling more depressed or anxious, it was accompanied by a period of medicinal noncompliance. (Tr. 427–28, 459–60). Plaintiff also reported being independent in performing household chores, shopping, and taking his medications, as well as, making and keeping his appointments. (Tr. 427). Moreover, at a great many of Plaintiff's medical appointments he was reported as cooperative with normal speech tone and rhythm; in a bright or neutral mood with a full range of affect and a good general fund of knowledge; and as having unimpaired or reality based judgment and insight. (Tr. 443, 449, 587, 609, 640). Plaintiff also testified that he previously worked as an unsupervised property manager interacting with individuals, including showing properties, and he himself supervised three employees. (Tr. 76–77, 94–95). While some of those interactions may have been confrontational—such as collecting rent or evicting a tenant—Plaintiff testified that he only left the property manager position because of a disagreement in rental practices with the property owner unrelated to Plaintiff's interactions with tenants. (Tr. 77–78). At the same time Plaintiff was working as a property manager, he was also working as a trucking dispatcher, and at various times, he has engaged in substantial litigation with what he described as successful results. (Tr. 79–81, 98).

The ALJ also considered state agency psychological consultant Dr. Boyd's opinion that Plaintiff had a severe mental impairment, and the ALJ discounted that opinion for proper reasons

observing that medical records from after Dr. Boyd's opinion (which were obviously unavailable to Dr. Boyd) suggested a lesser mental impairment. (Tr. 14).[11] Treatment records from after Dr. Boyd's opinion show that when Plaintiff was medicinally compliant he reported being satisfied with his medication in treating his depression. (Tr. 498–99, 639). After the date of Dr. Boyd's opinion, Plaintiff was also reported as cooperative with normal speech tone and rhythm; in a bright or neutral mood with a full range of affect and a good general fund of knowledge; and as having unimpaired or reality based judgment and insight. (Tr. 587, 609, 624, 640, 646).

Moreover, the record indicated two one-year-long gaps of time in which Plaintiff did not seek any mental health treatment—from February 2, 2012, until February 5, 2013, and from January 28, 2014, until February 25, 2015. (Tr. 427–29, 607–09).

Accordingly, the Court concludes that the ALJ's findings at step two of the analysis were supported by substantial evidence in the record as a whole.

**2.  Step Three – Impairment Severity**

The Court's review of the objective medical evidence in the record has not revealed any evidence that would contradict the ALJ's findings at step three of the analysis concluding that Plaintiff's medically identifiable physical impairments were not medically equivalent in severity to a listed disability.

Plaintiff again merely asserts in a conclusory fashion that the ALJ failed to "consider well documented relevant evidence in regard to [Plaintiff's] neck pain or neck injury in any respect nor as shown elsewhere in this document the ALJ did not consider relevant evidence in regard to [Plaintiff's] sleep apnea diagnosis . . . ." (Plf.'s Mem., [Docket No. 17], at 9). Plaintiff does not specifically identify the evidence to which he is referring, and the Court's review of the record

---

[11] Plaintiff argues that the ALJ failed to provide the records to Dr. Boyd at the time Dr. Boyd created his opinion, however, the record makes clear that the records to which the ALJ is referring are records which were generated in connection with Plaintiff's medical treatment and Function Reports after Dr. Boyd created his opinion.

failed to identify any evidence which would contradict the ALJ's conclusion that Plaintiff's medically identifiable physical impairments were not medically equivalent in severity to a listed disability.

Furthermore, there is a difference between, on the one hand, declining to provide a detailed discussion of particular medical evidence and, on the other hand, failing to consider it or ignoring it. See, e.g., Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (stating that an ALJ's failure to specifically cite to opinions of certain treating sources does not indicate that those opinions were "not considered" by the ALJ) (citing Montgomery v. Chater, 69 F.3d 273, 275 (8th Cir. 1995)). In the present case, the record demonstrates that the ALJ considered the entire records as a whole, including all physical symptoms consistent with the objective medical evidence and other evidence, as well as, the opinion evidence in the record.

Accordingly, the Court concludes that the ALJ's findings at step three of the analysis were supported by substantial evidence in the record as a whole.

### 3.  Step Four – Residual Functional Capacity and Ability to Perform Past Relevant Work

At step four, the ALJ found that Plaintiff was able to perform his past relevant work. Plaintiff argues that the finding was not supported by substantial evidence in the record as a whole because it was based on an erroneous residual functional capacity (RFC) and because Plaintiff was mischaracterized as a property manager. The Court's review of the record indicated that the ALJ's residual functional capacity determination was based on Plaintiff's testimony, the objective medical evidence in the record, and the opinions of Dr. Bijpuria and Dr. Van Nostrand.

In Plaintiff's favor, the ALJ expressly gave limited weight to Dr. Bijpuria's opinion of medium exertion reasoning that MRI findings and Plaintiff's heart attack that occurred after Dr. Bijpuria's opinion suggest a lesser exertional ability than that opined by Dr. Bijpuria. (Tr. 18).

Also in Plaintiff's favor and for the same reason, the ALJ declined to adopt Dr. Van Nostrand's opinion that Plaintiff could use stairs repeatedly and was able to crawl and kneel. (Tr. 18). It does not appear Plaintiff argues these conclusions in his favor were improper.

Reviewing the objective medical evidence in the record, the ALJ determined that the conservative course of treatment failed to suggest the degree of distress and impairment alleged, and instead, supported the residual functional capacity as assessed. With the exception of Plaintiff's heart attack, Plaintiff was not admitted to the hospital for any physical impairment, and the record fails to demonstrate a significant number of emergency department or urgent care presentations related to any physical impairments. Likewise, the record fails to indicate that Plaintiff underwent any prolonged course of physical or occupational therapy. Moreover, Plaintiff did not have any form of regimented pain management until 2013. (Tr. 427–29, 430). To the extent Plaintiff now argues that this delay in pain management was over his objection because he had been asking for the medication, that argument is refuted by the record which indicates that after his medication management appointment in February 2, 2012, Plaintiff declined to return to his medication management appointments until February 5, 2013, despite an order to return three months after his February 2, 2012, appointment. (Tr. 427–32). The consistent course of conservative treatment in the medical record as a whole indicates a pain level less than the debilitating pain level now alleged by Plaintiff. Milam v. Colvin, 794 F.3d 978, 985 (8th Cir. 2015); see also, McDade v. Astrue, 720 F.3d 994, 1001 (8th Cir. 2013) (providing that the ALJ had discredited claimant's allegations of completely disabling pain for "legally sufficient reasons" including the absence of long term narcotic pain medication).

Importantly, the objective medical evidence in the record as a whole demonstrates that Plaintiff's back pain and other symptoms could be alleviated, improved, and maintained through

41

these conservative treatments. On several occasions Plaintiff—when medicinally compliant—reported minimal or no pain, and as recently as February 25, 2015, Plaintiff reported feeling "good physically" and denied any pain. (Tr. 430–31, 435, 508–09, 524, 528, 607–08). Before Plaintiff had a lumbar medial branch block he reported his pain at a fifty out of one hundred, and after the procedure, Plaintiff reported his pain at a zero out of one hundred. (Tr. 509). At his follow up appointment, Plaintiff noted that he had an 85% improvement after the procedure. (Tr. 524, 528). Plaintiff reported similar success after his second medial branch block procedure. (Tr. 509). "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010) (quoting Brace v. Astrue, 578 F.3d 882, 885 (8th Cir. 2009)). Such is the case here.

Moreover, Plaintiff's reported physical activities, especially when considered in conjunction with the objective medical evidence, further undermines his assertion of disabling pain and supports the ALJ assessed residual functional capacity. See, e.g., Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003) (finding that the claimant's ability to shop, drive short distances, attend church, and visit relatives was inconsistent with her assertion of disabling pain); Lawrence v. Chater, 107 F.3d 674, 676 (8th Cir. 1997) (finding that the claimant's ability to "dress and bathe herself," and "do some housework, cooking, and shopping" contradicted her "testimony regarding the severity of her pain and disability"). Plaintiff variously reported that he had done some light cutting of firewood and shoveling; that he walked up to a half mile daily in 2013; that his was able bathe himself, as well as, dress himself with occasional help with his socks and boot; that he could lift fifty pounds, stand or sit for thirty minutes, and mow his lawn with a self-propelled lawn mower; and that he drove an average of thirty miles per day. (Tr. 430, 448, 483, 634).

Based on the foregoing, the Court concludes that the ALJ's residual functional capacity (RFC) determination was supported by substantial evidence in the record as a whole.

The ALJ next concluded that Plaintiff had past relevant work as a property manager reasoning that the work was performed in the last fifteen years at a substantial gainful activity level. (Tr. 20). Relying on the testimony of IVE Mastbaum, the ALJ concluded that Plaintiff was able to perform his past relevant work as actually performed. (Tr. 20–21). Plaintiff argues that he was incorrectly mischaracterized as a property manager as defined by the Dictionary of Occupational Titles because he performed duties in excess of those listed in the Dictionary of Occupational Titles and that his position as a property manager was not past relevant work. (Plf.'s Mem, [Docket No. 17], at 12–13). Plaintiff's arguments here are unpersuasive.

Plaintiff now argues that he was mischaracterized as a property manager (DOT 186167-018) because he also actually performed repairs and maintenance which is not required by property manager (DOT 186167-018). (Plf.'s Mem, [Docket No. 17], at 12–13). Plaintiff's assertion, however, is not supported by the record. At the administrative hearing, Plaintiff was specifically asked about his duties when he was a property manager, and he testified that his duties as property manager included collecting rent, preparing leases, showing properties, and managing three other employees, as well as, "paperwork and legal stuff." (Tr. 95–96). The Court's review of the record fails to uncover any mention of the Plaintiff performing any repairs or maintenance during his work as a property manager. In any event, the description of property manager (DOT 186167-018) provides for directing and coordinating activates of maintenance staff, as well as, personally performing "minor repairs." DICOT 186.167-018 ("May clean public areas of buildings and make minor repairs to equipment or appliances.").

Substantial evidence supports the ALJ's conclusion that Plaintiff's work as a property manager was past relevant work. Past relevant work means work performed in the past fifteen years which lasted long enough for the claimant to learn to do the job, and it must have been substantial gainful activity. Randal v. Astrue, No. 7-cv-3787 (RHK/FLN), 2008 WL 4101165, at *8 (D. Minn. Aug. 27, 2008). The record clearly indicates, and Plaintiff does not appear to refute, that Plaintiff held the property manager position within the last fifteen years. (Tr. 76–77, 95–96) Despite Plaintiff's general assertion that he did not hold the property manager position long enough to learn it, substantial evidence supports the conclusion that Plaintiff held the position long enough for him to learn to do the job. Plaintiff indicated that he performed his position as a property manager without supervision from his employer for six to nine months in 2010, and he testified that the only reason he left was his disagreement with the property owner over certain rental practices. (Tr. 77–78, 94). There is no evidence suggesting that Plaintiff failed to learn his job or that he did not competently perform any of his duties in that position. Therefore, substantial evidence supports the ALJ's finding that the position of property manager was past relevant work. Moad v. Massanari, 260 F.3d 887, 891 (8th Cir. 2001) (finding the ALJ did not err in determining claimant's work as a general relief director constituted past relevant work because "there [was] no evidence suggesting [she] failed to learn her job as general relief director or did not competently perform any of her duties in that position").

Substantial evidence also supports the AJL finding that Plaintiff's past work as a property manager was substantial gainful activity. Substantial gainful activity is defined as work which is both substantial and gainful. Comstock v. Chater, 91 F.3d 1143, 1145 (8th Cir. 1996). Substantial activity is significant physical or mental work that is done on a full or part time basis. Id. Gainful activity is simply work that is done for compensation. Id. A plaintiff is presumed to

be engaged in substantial gainful activity if his earnings from that activity exceed the limits set by the regulations. Id. For earnings after 2000, Courts use a formula for calculating the maximum earning provided by the Social Security Administration and available at https://www.ssa.gov/OACT/COLA.sga.html. Dukes v. Barnhart, 436 F.3d 923, 927, 927 n. 3 (8th Cir. 2006). The earnings limit set by regulation for 2010 was $1,000.00. See, https://www.ssa.gov/OACT/COLA.sga.html.

As described above, the record, particularly Plaintiff's own testimony, demonstrates that Plaintiff's work as a property manager was significant physical and mental work done for compensation. (Tr. 76–78, 94–96). Plaintiff testified that he was paid $250.00 a week in cash as a property manager. (Tr. 95–96). As a month contains more days than simply four work weeks, Plaintiff earned more than the allowed $1,000.00 a month, and multiple months in 2010 contain enough days that more than four paydays would have fallen in a single month.[12] Thus, Plaintiff's position as a property manager was substantial gainful activity. Moreover, Plaintiff testified that at the same time he was working as a property manager he was also working dispatching trucks; however, he did not indicate the amount of income he received, and the dispatcher position like the property manager position is not reported on Plaintiff's Social Security earnings report or work history report. (Tr. 98).

Therefore, Plaintiff has not met his burden of showing that the ALJ erred in determining that his work experience as a property manager qualified as past relevant work. See, Barnes v. Sullivan, 932 F.2d 1356, 1359 (11th Cir. 1991) ("[A] claimant has the burden of showing that certain work experience is not past relevant work.").

---

[12] At step one of the sequential analysis, the ALJ noted that it was not there "necessary to determine whether the work activity constitutes disqualifying substantial gainful activity," as "there exists a valid basis for denying the claimant's application." (Tr. 11). Therefore, at step one of the analysis, the ALJ assumed Plaintiff had not engaged in substantial gainful employment since his alleged onset date. That assumption does not conflict with the ALJ's findings at step four.

Relying on the testimony of the independent vocational expert, IVE Mastbaum, who opined that a hypothetical individual with Plaintiff's assessed residual functional capacity (RFC) would be able to perform Plaintiff's past relevant work as a property manager as actually performed, the ALJ concluded that Plaintiff was able to perform his past relevant work as a property manager. (Tr. 20–21). The ALJ's decision that Plaintiff could perform his past relevant work is therefore supported by substantial evidence. See, Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (providing that "[t]he ALJ's hypothetical question need include only those impairments that the ALJ finds are substantially supported by the record as a whole," and "[t]estimony from a VE based on a properly phrased hypothetical question constitutes substantial evidence") (quotations and citations omitted)).

Based on all of the foregoing, the Court recommends Plaintiff's Motion for Summary Judgment, [Docket No. 16], be **DENIED**, and Defendant's Motion for Summary Judgment, [Docket No. 22], be **GRANTED**.

## IV.    CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1.  Plaintiff's Motion for Summary Judgment, [Docket No. 16], be **DENIED**; and,

2.  Defendant's Motion for Summary Judgment, [Docket No. 22], be **GRANTED**.

Dated: June 29, 2017                                    s/Leo I. Brisbois
                                                        Leo I. Brisbois
                                                        U.S. MAGISTRATE JUDGE

46

**N O T I C E**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).